**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-1499

FARM LABOR ORGANIZING COMMITTEE; VALENTIN ALVARADO HERNANDEZ,

        Plaintiffs – Appellants,

  v.

JOSHUA STEIN, in his official capacity as Attorney General of the State of North Carolina,

        Defendant – Appellee,

  and

ROY COOPER, in his official capacity as governor of the State of North Carolina; MARION R. WARREN, in his official capacity as Director of the North Carolina Administrative Office of the Courts,

        Defendants,

NORTH CAROLINA FARM BUREAU,

        Intervenor/Defendant.

------------------------------

EL VINCULO HISPANO; FARMWORKER JUSTICE; NATIONAL EMPLOYMENT LAW PROJECT; EPISCOPAL FARMWORKER MINISTRY; NORTH CAROLINA STATE AFL-CIO; NORTH CAROLINA STATE CONFERENCE OF THE NAACP; STUDENT ACTION WITH FARMWORKERS; WESTERN NORTH CAROLINA WORKERS' CENTER,

        Amici Supporting Appellant.

NATIONAL RIGHT TO WORK LEGAL DEFENSE FOUNDATION, INC.; NORTH CAROLINA FARM BUREAU FEDERATION, INC.,

        Amici Supporting Appellee.

————————

**No. 21-1541**

————————

FARM LABOR ORGANIZING COMMITTEE; VALENTIN ALVARADO HERNANDEZ,

        Plaintiffs – Appellees,

  v.

JOSHUA STEIN, in his official capacity as Attorney General of the State of North Carolina,

        Defendant – Appellant,

  and

ROY COOPER, in his official capacity as governor of the State of North Carolina; MARION R. WARREN, in his official capacity as Director of the North Carolina Administrative Office of the Courts,

        Defendants,

NORTH CAROLINA FARM BUREAU,

        Intervenor/Defendant.

------------------------------

NATIONAL RIGHT TO WORK LEGAL DEFENSE FOUNDATION, INC.; NORTH CAROLINA FARM BUREAU FEDERATION, INC.,

        Amici Supporting Appellant.

————————

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. Loretta C. Biggs, District Judge. (1:17-cv-01037-LCB-LPA)

Argued: September 14, 2022                    Decided: December 28, 2022

Before RICHARDSON and HEYTENS, Circuit Judges, and MOTZ, Senior Circuit Judge.

Affirmed in part, reversed in part, and vacated in part by published opinion. Senior Judge Motz wrote the opinion, in which Judge Heytens joined. Judge Richardson wrote a separate opinion, concurring in the judgment.

**ARGUED:** Kristi Lee Graunke, ACLU OF NORTH CAROLINA LEGAL FOUNDATION, Raleigh, North Carolina, for Appellants/Cross-Appellees. Matthew Thomas Tulchin, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee/Cross-Appellant. **ON BRIEF:** Jaclyn Maffetore, ACLU OF NORTH CAROLINA LEGAL FOUNDATION, Raleigh, North Carolina; Julia Solórzano, Decatur, Georgia, Meredith B. Stewart, SOUTHERN POVERTY LAW CENTER, New Orleans, Louisiana; Carol Brooke, Clermont Fraser Ripley, NORTH CAROLINA JUSTICE CENTER, Raleigh, North Carolina; Brian Hauss, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York; Robert J. Willis, LAW OFFICE OF ROBERT J. WILLIS, P.A., Pittsboro, North Carolina, for Appellants/Cross-Appellees. Josh Stein, Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee/Cross-Appellant. Trent Taylor, FARMWORKER JUSTICE, Washington, D.C., for Amici Farmworker Justice, National Employment Law Project, Episcopal Farmworker Ministry, North Carolina State AFL-CIO, Student Action with Farmworkers, El Vinculo Hispano, Western North Carolina Workers' Center and North Carolina State Conference of the National Association for the Advancement of Colored People. Raymond J. LaJeunesse, William L. Messenger, NATIONAL RIGHT TO WORK LEGAL DEFENSE FOUNDATION, INC., Springfield, Virginia, for Amicus National Right to Work Legal Defense Foundation, Inc. Phillip Jacob Parker, Jr., Secretary and General Counsel, Stephen A. Woodson, Senior Associate General Counsel, NORTH CAROLINA FARM BUREAU FEDERATION, INC., Raleigh, North Carolina, for Amicus North Carolina Farm Bureau Federation, Inc.

3

DIANA GRIBBON MOTZ, Senior Circuit Judge:

Section 20.5 of North Carolina's 2017 Farm Act contains provisions making it illegal to enter into two types of contractual agreements: (1) any settlement agreement conditioned on an agricultural producer's union affiliation (the Settlement Provision) and (2) any agreement that would require an agricultural producer to process dues checkoffs for its farmworker-employees (the Dues Provision). The Farm Labor Organizing Committee and Valentin Alvarado Hernández (collectively, FLOC) contend that these prohibitions violate the First Amendment, Fourteenth Amendment, and 42 U.S.C. § 1981. FLOC initiated this action against Joshua Stein, the Attorney General of North Carolina, and Roy Cooper, the Governor of North Carolina (collectively, the State), seeking to invalidate and enjoin both provisions. In response to cross motions for summary judgment, the district court held that the Settlement Provision violated the Constitution and so enjoined it, but upheld the constitutionality of the Dues Provision, and then held that neither provision violated § 1981. For the following reasons, we reverse the judgment of the district court as to the Settlement Provision and vacate the accompanying injunction, but affirm in all other respects.

## I.

### A.

This lawsuit concerns North Carolina's agricultural sector. Agriculture and agribusiness account for one-sixth of the state's economy and employ about 15% of its workforce. The vibrance of the state's agricultural community has resulted in North

Carolina becoming a major producer of tobacco, Christmas trees, soybeans, corn, hay, and cotton.[1]

North Carolina's agricultural prominence owes much to the efforts of the state's farmworkers. Most (95%) North Carolina farmworkers are Latinx, primarily of Mexican descent. A substantial portion of these farmworkers are non-citizen H-2A workers, who are granted limited entry into the United States to work in the agricultural sector. The high percentage of Latinx farmworkers stands in stark contrast to the racial demographics of farm owners, who are almost always white.

The parties stipulate that FLOC, "the only [farmworker] labor union or labor organization in the state of North Carolina which engages in collective bargaining," represents many of the state's farmworkers. FLOC alleges that "[f]armworkers frequently experience pesticide exposure, inadequate access to drinking water and restrooms, and dilapidated labor camp housing." FLOC Opening Br. at 7. And it contends that farmworkers are particularly vulnerable to wage theft and other forms of mistreatment. According to FLOC, these problems are compounded for H-2A farmworkers who "rely on their employers for transportation, housing, and other basic needs," and whose lawful presence in the United States is inextricably linked to their relationship with their employer.

FLOC maintains that it is imperative that farmworkers retain the ability to organize collectively to achieve safe working environments, fair wages, and meaningful workplace grievance procedures. To do so, prior to enactment of Section 20.5, FLOC particularly

---

[1] The material facts in this case are largely undisputed. Unless noted to the contrary, the parties' Joint Stipulations of Fact provide the basis for the facts set forth within.

relied on settlement agreements and dues checkoff agreements between agricultural producers and their employees.

Settlement agreements provide FLOC the ability to assist members with "securing settlements that include voluntary union recognition, entry into collective bargaining agreements (CBAs), or agreements by employers to remain neutral on employee union membership." FLOC Resp. & Reply Br. at 3. Practically speaking, these settlement terms allow FLOC to expand its reach while simultaneously allowing the parties to avoid protracted litigation.

In dues checkoff agreements, the agricultural producer agrees to withhold a portion of FLOC members' pay and then transfer the withheld earnings to FLOC as payment for that members' union dues. Because many FLOC members lack access to traditional banking institutions, this serves as a convenient way to ensure timely payment of dues.

It is undisputed that Section 20.5, the legislation FLOC challenges in this suit, effectively prohibits parties from entering into, and thus FLOC from relying on, settlement agreements and dues checkoff agreements.

## B.

The State explains that the challenged legislation is a product of North Carolina's long history as a "right-to-work" state. *See* State Opening & Resp. Br. at 4. Right-to-work laws "prohibit[] agreements—even between willing unions and employers—that would condition employment on being a member of a union." *Id.* North Carolina has repeatedly reaffirmed its right-to-work status, including in a 2013 law that "prohibits preferential pricing or access in purchase agreements" based on an agricultural producer's "status as a

6

union or nonunion employer." *Id.* The State maintains that right-to-work policies ensure that both employees and employers retain the ability to freely choose whether to affiliate with a union. *See id.* at 4–5.

As State Senator William Brent Jackson, a co-sponsor of the legislation, explained during floor debate on the legislation, "Section 20.5 just strengthens our right to work statutes by declaring certain agreements involving agricultural producers are [against] public policy." The House sponsor, Representative Jimmy Dixon, similarly commented that the legislation was necessary to combat the "continued harassment" from "predatory folks [who] make a good living coming around and getting [farmworkers] to be dissatisfied." Representative Dixon noted further that Section 20.5 reinforces North Carolina's right-to-work policies and reduces a "regulatory burden on farms that is not required under federal law and is completely within the State's purview to regulate."

With minimal floor debate, the bill passed in both houses of the North Carolina General Assembly and was signed into law. Representative Dixon told the media that Section 20.5 would "enhance [the] local agricultural community and possibly be a deterrent to outside organizations in making attempts to establish unions where folks really don't want them or need them." Senator Jackson agreed that this was why the legislation was necessary.

## C.

FLOC brought this action challenging Section 20.5's Settlement Provision and Dues Provision in the Middle District of North Carolina. In considering the parties' cross motions for summary judgment, the district court held the Settlement Provision violated

the First and Fourteenth Amendments and enjoined its enforcement.  But the court upheld the constitutionality of the Dues Provision, and held that both provisions survived FLOC's challenge under 42 U.S.C. § 1981.

The parties timely filed cross appeals.  "We review a district court's grant of a motion for summary judgment de novo, applying the same legal standards as the district court."  *Nader v. Blair*, 549 F.3d 953, 958 (4th Cir. 2008) (citing *Nguyen v. CNA Corp.*, 44 F.3d 234, 236 (4th Cir. 1995)).  We review de novo a district court's interpretation of a state statute, deferring to "the statutory construction rules applied by the state's highest court."  *In re DNA Ex Post Facto Issues*, 561 F.3d 294, 300 (4th Cir. 2009).  When construing a statute, the Supreme Court of North Carolina reads text "within the context of the statute" rather than in isolation.  *Stahle v. CTS Corp.*, 817 F.3d 96, 105 (4th Cir. 2016) (quoting *Brown v. Flowe*, 507 S.E.2d 894, 896 (N.C. 1998)).  If the text is unambiguous, the statutory inquiry is complete.  *Carolina Power & Light Co. v. City of Asheville*, 597 S.E.2d 717, 722 (N.C. 2004).

## II.

We initially address FLOC's First Amendment challenge to the Settlement Provision.

## A.

The Settlement Provision provides:

Any provision that directly or indirectly conditions . . . *the terms of an agreement not to sue or settle litigation* upon an agricultural producer's status as a union or nonunion employer or entry into or refusal to enter into an agreement with a labor union or labor organization is invalid and unenforceable as against public policy . . . .

8

N.C. Gen. Stat. § 95-79(b) (emphasis added).

The Settlement Provision thus prohibits parties from agreeing to any settlement that is *conditioned* on an agricultural producer's affiliation (or non-affiliation) with a labor union. FLOC urges us to resist this natural reading of the Settlement Provision and hold instead, as the district court did, that the provision prohibits an agricultural producer from entering into any (and every) settlement agreement with a labor union. FLOC's reading, however, cannot be reconciled with the Settlement Provision's unambiguous text and statutory context. *See Brown*, 507 S.E.2d at 896.

The challenged statute unmistakably tells us what it outlaws: "[a]ny *provision* that directly or indirectly conditions" a settlement agreement on certain enumerated terms. N.C. Gen. Stat. § 95-79(b) (emphasis added). The statute then goes on to list which settlement terms violate the statute — namely, terms concerning "an agricultural producer's status as a union or nonunion employer" and those related to an agricultural producer's "entry into or refusal to enter into an agreement with a labor union or labor organization." *Id.* In short, the Settlement Provision is not aimed at precluding settlements based on *who* the parties are but rather *what* those settlement conditions say.

This unambiguous reading accords with the relevant legislative history. *See State v. Rankin*, 821 S.E.2d 787, 792 (N.C. 2018) (explaining that "[t]he intent of the General Assembly may be found first from the plain language of the statute, then from the legislative history, the spirit of the act and what the act seeks to accomplish" (quoting *State v. Langley*, 817 S.E.2d 191, 196 (N.C. 2018))); *Turlington v. McLeod*, 374 S.E.2d 394, 397 (N.C. 1988) ("In the construction of statutes, our primary task is to determine legislative

intent . . . ."). Recall that the legislation's co-sponsors, Senator Jackson and Representative Dixon, were worried about "the use of litigation to force farms to unionize." As the State explains, it was not the fact of the lawsuits themselves nor FLOC's attempts to settle those lawsuits that prompted concern. Rather, it was individual plaintiffs' efforts to use settlement agreements "to force collective-bargaining agreements as a settlement *condition*" that the legislators sought to deter. State Opening & Resp. Br. at 65–66.

Accordingly, we can reach only one conclusion: the Settlement Provision prohibits parties from conditioning a settlement agreement on an agricultural producer's union affiliation. We reject the broad reading advanced by FLOC and adopted by the district court that this statutory provision bars any settlement agreement between an agricultural producer and labor union.

## B.

FLOC also maintains that the Settlement Provision violates the First Amendment because it eliminates its members' right of expressive association and ability "to advance their shared goals through litigation." FLOC Resp. & Reply Br. at 51. This argument falters at the outset because, as explained above, the Settlement Provision merely proscribes certain settlement terms; it does not bar farmworkers and their union from vindicating their rights through the judicial system.

Of course, it is true, as FLOC argues, that the Supreme Court has recognized First Amendment protections for certain litigation-related activities. The seminal case in this respect is *NAACP v. Button*, 371 U.S. 415 (1963). There, the Court considered Virginia's ban on the "improper solicitation of legal business." *Id.* at 429. The challenged statutes

10

prohibited legal services organizations, like the NAACP Legal Defense Fund, from soliciting clients unless the organization itself was a party to or had a pecuniary interest in the underlying litigation. *Id.* at 423. The Court recognized that associating for the purposes of litigation "may be the most effective form of political association" for groups seeking to vindicate the legal rights of underrepresented minorities. *Id.* at 431. And because Virginia's solicitation ban criminalized the act of advising individuals of their legal rights and referring them to legal counsel for assistance, the Court held that the ban infringed on vital First Amendment protections. *Id.* at 434–37.

Similar First Amendment issues arose in *United Transportation Union v. State Bar of Michigan*, 401 U.S. 576 (1971), and *In re Primus*, 436 U.S. 412 (1978). In the former, the Supreme Court struck down a decree that prohibited a union from employing legal counsel to represent its members' interests in Federal Employers' Liability Act cases. 401 U.S. at 580–81. The Court held that the prohibition violated "the First Amendment principle that groups can unite to assert their legal rights." *Id.* at 580. Later, the *In re Primus* Court struck down an attorney discipline rule that prohibited public interest lawyers from contacting prospective litigants to advise them that free legal services were available. 436 U.S. at 414, 437–38. *In re Primus* reemphasized that prohibitions against legal solicitation must be carefully tailored to avoid stifling "political expression or association." *Id.* at 434.

The Settlement Provision bears no resemblance to the prohibitions in *Button* and its progeny. As the Supreme Court clarified in *United Transportation Union*, the through line of those cases is that "collective activity undertaken to obtain meaningful access to the

11

courts is a fundamental right within the protection of the First Amendment."  401 U.S. at 585.  The Settlement Provision does not prevent farmworkers from affiliating with lawyers, nor does it foreclose any legal cause of action or opportunity to resolve such an action in or out of court.  All the Settlement Provision does is prevent parties from agreeing to a settlement that is conditioned on an agricultural producer's affiliation with a labor union.[2]  Because the Settlement Provision leaves undisturbed the ability of farmworkers and farmworker unions to associate with one another and advance their cause through the judicial system, we see no First Amendment violation.

III.

We turn now to FLOC's First Amendment challenge to the Dues Provision.

A.

The Dues Provision provides:

> Further, notwithstanding G.S. 95-25.8, an agreement requiring an agricultural producer to transfer funds to a labor union or labor organization for the purpose of paying an employee's membership fee or dues is invalid and unenforceable against public policy in restraint of trade or commerce in the State of North Carolina.

N.C. Gen. Stat. § 95-79(b).

---

[2] Our recent decision in *Capital Associated Industries, Inc. v. Stein*, 922 F.3d 198 (4th Cir. 2019), comes to a similar conclusion.  There, a trade association sought to provide legal services as part of its membership package.  *Id.* at 202.  The association was unable to do so under North Carolina's unauthorized practice of law statutes, which forbid corporations from practicing law.  *Id.*  We held that the challenged statutes raised no First Amendment freedom of association concern, in part because the statutes did not undermine the challengers' meaningful access to the courts.  *Id.* at 206.

The parties agree that the Dues Provision bars the creation of contracts that *require* an agricultural producer to process dues checkoffs for its employees.  But they diverge on whether an agricultural producer could decide to process dues checkoffs for farmworkers on a voluntary, informal basis.  We believe the State properly interprets Section 20.5 — that is, under the statute, agricultural producers retain discretion as to whether to process dues checkoffs.  The Dues Provision only prohibits "agreement[s]" that strip agricultural producers of such discretion.

We note that the text of the Dues Provision states that the statute applies notwithstanding G.S. § 95-25.8.  The latter statute provides that "[a]n employer may withhold or divert any portion of an employee's wages" when, among other things, "the amount or rate of the proposed deduction is known and agreed upon in advance."  *See* N.C. Gen. Stat. § 95-25.8(a)(2).  Section 95-25.8 thus ensures that employees, who ordinarily are entitled to all wages due and owed, consent to any payroll deductions.  *Id.*  In contrast, the Dues Provision prohibits a formalized agreement, like a collective bargaining agreement, from *mandating* that an agricultural producer process dues checkoffs.  N.C. Gen. Stat. § 95-79(b).  Thus, the plain language of the Dues Provision renders unlawful only "agreement[s] *requiring* an agricultural producer" to process dues checkoffs.  *Id.* (emphasis added).

This commonsense reading gives meaning to the "notwithstanding" clause in the Dues Provision and allows us to read it harmoniously with the statute to which it refers, Section 95-25.8.  *See Victory Cab Co. v. City of Charlotte*, 68 S.E.2d 433, 437 (N.C. 1951) (noting that related statutes "ordinarily . . . should be construed . . . so as to give full force

13

and effect to each of them").  Indeed, it would be unnecessary for the Dues Provision to mention "*agreement[s] requiring* an agricultural producer to transfer funds," if the General Assembly had outlawed all dues checkoffs agreements.  *See State v. James*, 813 S.E.2d 195, 203 (N.C. 2018) (explaining that courts may not delete or insert words not used in the statute).

As is the case with the Settlement Provision, the legislative history confirms our conclusion.  Before Section 20.5 was introduced, the General Assembly proposed a bill that stated that "an employer shall not withhold or divert any portion of an employee's wages for the benefit of any labor organization."  FLOC Opening Br. at 13–14.  This broad legislation, which would have barred all labor union dues checkoffs, failed.  Tellingly, the General Assembly did not replicate that language in Section 20.5's Dues Provision. Instead, the legislature outlawed only "agreement[s]" requiring dues checkoffs, an implicit indication that it sought to do something narrower in scope than ban all dues checkoffs.

We therefore agree with the State and the district court that the Dues Provision permits an agricultural producer to determine, at its discretion, whether to process dues checkoffs for its employees.

B.

Even so, FLOC contends that the Dues Provision violates the First Amendment, because it singles FLOC out for an "onerous regulatory burden" that has hampered its ability to engage in expressive activity.  FLOC draws our attention to *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575 (1983), a case in which Minnesota "impose[d] a special tax on the press."  *Id.* at 576.  FLOC argues that the Dues

14

Provision, like that tax, violates the First Amendment because it too selectively subjects an expressive association to "extremely onerous regulatory restrictions." FLOC Opening Br. at 28.

As an initial matter, we are unconvinced by FLOC's argument that it has been selectively targeted in the same manner as the newspapers in *Minneapolis Star*. There, the taxation scheme not only "single[d] out the press" for a special tax, but also "tailor[ed] the tax so that it single[d] out a few members of the press." 460 U.S. at 591–92. Here, in contrast, Section 20.5 treats all farmworker unions and agricultural producers alike. *See* N.C. Gen. Stat. § 95-79(b). And so, although presently FLOC may be "North Carolina's only farmworker union," the fact remains that Section 20.5 would treat any newcomer farmworker union the same. FLOC Opening Br. at 3; *see* N.C. Gen. Stat. § 95-79(b); *cf. Hettinga v. United States*, 677 F.3d 471 (D.C. Cir. 2012) ("A statute with open-ended applicability, i.e., 'one that attaches not to specified organizations but to described activities in which an organization may or may not engage,' does not single out a particular person or group for punishment." (quoting *Communist Party v. Subversive Activities Control Bd.*, 367 U.S. 1, 5 (1961))).

Moreover, our precedent forecloses this challenge to the Dues Provision. In *South Carolina Education Association v. Campbell*, 883 F.2d 1251, 1253 (4th Cir. 1989), we considered the constitutionality of South Carolina legislation "which authorized payroll deductions for contributions to charitable organizations but declined to authorize payroll deductions for membership dues to labor organizations." We were thus called on to decide

15

whether the state's prohibition against dues checkoffs violated the First Amendment's protection of free speech and expression. *See id.* at 1256–57.

In *Campbell*, the appellants made a First Amendment argument that is virtually indistinguishable from the one advanced by FLOC: "that when membership dues are not withheld from wages, members are less likely to pay their dues and the association is impaired in its lobbying activities, legal advocacy program and other services." *Id.* at 1256. We rejected that argument, explaining that "there is no constitutional right to payroll deductions" and that the appellant's "First Amendment claim [was] not founded on any direct impact the legislation ha[d] on free speech or the free flow of information." *Id.* As we have said elsewhere, dues checkoffs are, at most, "simply an administrative convenience for the collection of dues." *Anheuser-Bush, Inc. v. Int'l Bhd. of Teamsters, Loc. 822,* 584 F.2d 41, 43 (4th Cir. 1978). Like the union in *Campbell*, FLOC's First Amendment interests have not been hampered. It remains able "to associate, to solicit members, to express its views, to publish or disseminate material, to engage in political activities, [and] to affiliate or cooperate with other groups." *Campbell*, 883 F.2d at 1256.

Were *Campbell* not instructive enough standing alone, its rationale has been bolstered by the Supreme Court. In *Ysursa v. Pocatello Education Association*, 555 U.S. 353, 355 (2009), the Court upheld an Idaho law that banned checkoffs by public employees for their union's political action committee. The Court explained that the First Amendment "protects the right to be free from government abridgement of speech" but does not require the government "to assist others in funding the expression of particular ideas, including political ones." *Id.* at 358. The Court went on to hold that the state's checkoffs prohibition

did not prevent the union or its members from engaging in speech and therefore was not subject to strict scrutiny review. *Id.* at 359.

FLOC contends that *Campbell* and *Ysursa* are inapposite because both concern instances where the state itself was acting as an employer. This factual distinction, however, does not undermine the principle that "loss of payroll deductions" is "not constitutionally impermissible." *Campbell*, 883 F.2d at 1256. As we explained in *Campbell*, even though such a loss "may economically burden the [union] and thereby impair its effectiveness," it is not the type of impairment "that the First Amendment proscribes." *Id.* at 1256–57.

IV.

We next consider FLOC's challenge under the Fourteenth Amendment. Unlike the First Amendment challenge, FLOC advances the same equal protection theory as to both the Settlement Provision and the Dues Provision.

The Fourteenth Amendment's Equal Protection Clause dictates that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. Stated differently, the Equal Protection Clause commands "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Courts thus examine closely any legislation that classifies persons based on immutable factors that "generally provide[] no sensible ground for differential treatment." *Id.* at 440.

Classifications on the basis of suspect factors like "race, alienage, or national origin," for example, are "so seldom relevant to the achievement of any legitimate state

17

interest" that they are upheld only when narrowly tailored to serve a compelling state interest. *Id*. Quasi-suspect factors, like an individual's sex, also "frequently bear[] no relation to the ability to perform or contribute to society" and are therefore unconstitutional unless "substantially related to a sufficiently important governmental interest." *Id.* at 440–41. This same level of heightened scrutiny applies, as we recognized in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), to classifications based on an individual's transgender identity.

But in the absence of a classification based on a suspect or quasi-suspect factor, we apply a deferential rational basis review unless the challenged legislation was enacted for a discriminatory purpose. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977); *Washington v. Davis*, 426 U.S. 229, 242 (1976). Accordingly, we begin our equal protection inquiry by determining whether Section 20.5 discriminates against a suspect or quasi-suspect class.

## A.

FLOC insists that it and its members belong to a quasi-suspect class given the

> starkly segregated hierarchy of the agricultural industry in the state, the fact that nearly all of FLOC's members and many North Carolina farmworkers cannot vote, the history of racialized exclusions of farmworkers from basic labor protections, and the utter lack of Latinx representation in the legislature that enacted Section 20.5.

FLOC Resp. & Reply Br. at 24. Reminding us of our admonition in *Grimm*, 972 F.3d at 613, that "no hard-and-fast rule prevents this Court from concluding that a quasi-suspect class" exists, FLOC asks that we recognize that North Carolina farmworkers and their

union are entitled to heightened scrutiny, as a quasi-suspect class, whenever their classification is invoked through legislation.

FLOC's reliance on *Grimm* is severely misplaced. Quite unlike the policy challenged in *Grimm*, Section 20.5 does not classify persons based on any "obvious, immutable, or distinguishing characteristics." 972 F.3d at 593, 611; *see also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271–75 (1979) (explaining that a veterans' preference statute was facially gender-neutral even though "its effects upon women [were] disproportionately adverse"). Indeed, to the extent that Section 20.5 incorporates any classification at all, that classification relates to a given economic sector — agriculture — not anything inherent to an individual's identity or an attribute shared by *all* farmworkers. By contrast, *Grimm* held that classifications involving transgender identity are quasi-suspect in part because transgender persons are "a discrete group with immutable characteristics." 972 F.3d at 612.

FLOC nevertheless argues that because North Carolina farmworkers disproportionately belong to already-defined protected classes (i.e., Latinx, non-citizens), any law that classifies on the basis of agriculture cannot be "neutral," as the term is used in equal protection jurisprudence. This attenuated fashioning of a quasi-suspect class runs far afield from our straightforward holding in *Grimm* that it was "apparent that transgender persons constitute a quasi-suspect class." 972 F.3d at 611. More, it runs counter to the Supreme Court's teaching in *Feeney* that facially neutral laws must be treated as such, even when those laws are accompanied by disparate effects. 442 U.S. at 271–74. We therefore reject FLOC's quasi-suspect class argument.

19

B.

Our equal protection journey does not end here, however.  FLOC also contends that strict scrutiny review applies because North Carolina used a facially neutral classification to produce a discriminatory impact motivated by a discriminatory purpose.  *See Arlington Heights*, 429 U.S. at 265–66.  But even if Section 20.5 produced a discriminatory impact because the challenged statutory scheme bears heavily on individuals who share protected, immutable characteristics, FLOC nonetheless falls far short of demonstrating that the legislation was crafted with discriminatory intent.[3]

To determine whether a legislature acted with intent to discriminate, we look to a list of non-exhaustive factors first identified in *Arlington Heights*.  The Supreme Court there explained that discriminatory purpose may be inferred from the challenged legislation's "(1) historical background; (2) the specific sequence of events leading to the law's enactment, including any departures from the normal legislative process; (3) the law's legislative history; and (4) whether the law 'bears more heavily on one race than

---

[3] FLOC mounts a related challenge under 42 U.S.C. § 1981.  Section 1981 guarantees "[a]ll persons . . . the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  To prevail on a § 1981 challenge, a plaintiff "must first plead and then prove that its injury would not have occurred 'but for' the defendant's unlawful conduct."  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1013 (2020).  FLOC's § 1981 challenge fails for much the same reason that its Fourteenth Amendment challenge fails.  *Cf. Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 389 (1982) (explaining that § 1981 is the "legislative cousin[] of the Fourteenth Amendment.").  Sheer speculation that "Section 20.5 would not have passed were it not for the fact that the people overwhelmingly impacted by it are non-citizens and Latinx," FLOC Opening Br. at 66, does not satisfy § 1981's but-for causation requirement.  Accordingly, the district court did not err in granting summary judgment in the State's favor on the § 1981 challenge.

another.'" *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020) (quoting *Arlington Heights*, 429 U.S. at 266).

To be sure, FLOC marshals compelling evidence of our nation's sordid history of racial discrimination in the agricultural industry. And we of course recognize North Carolina's recent discriminatory efforts in the voting rights context. *See Raymond*, 981 F.3d at 299, 305; *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 215, 223–27 (4th Cir. 2016). But the Supreme Court has instructed that we cannot place outsized weight on historical background. *See Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) ("The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination."); *see also Raymond*, 981 F.3d at 304. Although the broader history of legislation is always a relevant consideration, we must tread carefully so as not to undercut the presumption that legislators and legislatures act in good faith. *See Abbott*, 138 S. Ct. at 2325–26. Accordingly, the evidence of historical discrimination offered here is relevant, but hardly dispositive. *See Raymond,* 981 F.3d at 288 ("A legislature's past acts do not condemn the acts of a later legislature, which we must presume acts in good faith.").

Turning to the remaining *Arlington Heights* factors, FLOC makes much of the fact that Section 20.5 was enacted near the end of the legislative session and that it prompted minimal floor debate. In some circumstances this could signal a departure from the legislature's normal procedure, and so lend support to the proposition that something was amiss. *See, e.g.*, *McCrory*, 831 F.3d at 227–29. But FLOC offers no evidence that the North Carolina legislature acted contrary to its formal rules or its legislative norms. In

other words, FLOC has not offered evidence that anything about Section 20.5's enactment was so irregular that we can infer discrimination.

FLOC also asserts that Representative Dixon's references to "predatory folks" and "outside organizations" can be viewed as a subtle slight against FLOC members' racial identity. But nothing in the record suggests that any legislator focused on (or even considered) FLOC's racial makeup when drafting Section 20.5. Even when read generously to FLOC, Representative Dixon's comments at most suggest a skepticism about FLOC's unionization efforts, but they cast no aspersions on the identity of the individuals who make up FLOC's membership ranks. These remarks, however disapproving they may be, offer no evidence of racially discriminatory purpose embedded within the statute's legislative history.

And so, even accepting that the effects of Section 20.5 may be felt more deeply by "one race than another," the record before us does not demonstrate that the legislature enacted this law "'because of,' and not 'in spite of,' its discriminatory effect." *McCrory*, 831 F.3d at 220 (quoting *Feeney*, 442 U.S. at 279). As the Supreme Court recognized in *Feeney*, it is not enough that a legislature was merely aware of legislation's likely disparate impact. A statute violates the Equal Protection Clause only if disparate impact was the intended consequence of the legislation's enactment. Examination of the *Arlington Heights* factors does not reveal such a discriminatory intent here.[4]

---

[4] Alternatively, FLOC argues that the district court erred in granting summary judgment against FLOC on its equal protection challenge to the Dues Provision because questions of material fact remain. For the reasons already discussed, neither Section 20.5's (Continued)

V.

Because FLOC's First and Fourteenth Amendment claims do not merit a more intense form of scrutiny, rational basis review is appropriate. When rational basis review applies, a court accords legislative actions "a strong presumption of validity." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993). Rational basis review "simply requires courts to determine whether the classification in question is, at a minimum, rationally related to legitimate governmental goals." *Wilkins v. Gaddy*, 734 F.3d 344, 347–48 (4th Cir. 2013).

We have little trouble concluding that a rational basis supports Section 20.5. Agriculture is North Carolina's largest industry, which makes it a subject of great interest for state legislators. The state also embraces its right-to-work policies and has worked repeatedly to strengthen them. In addition to these general bases for enacting Section 20.5, both challenged provisions respond to discrete legislative concerns.

The Settlement Provision addresses what some legislators viewed as the coercive practice of using unrelated litigation to pressure agricultural producers into collective bargaining agreements. This practice, in the estimation of the North Carolina legislature, reduced an element of choice for agricultural producers in deciding whether to affiliate with a union.

---

statutory text nor its accompanying legislative history provides a basis to infer discriminatory intent. Accordingly, no genuine issues of material fact precluded entry of summary judgment. *See Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). FLOC's arguments to the contrary depend entirely on "mere speculation" and the "building of one inference upon another." *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

As for the Dues Provision, processing dues checkoffs requires an agricultural producer to "deduct union dues from their employees' pay each week, consolidate those deductions into one payment, and transfer the payment to FLOC monthly." State Opening & Resp. Br. at 14. As the State puts it, dues checkoffs agreements require agricultural producers to "expend *their own* resources to collect dues on the union's behalf" and essentially act as a union's treasurer. *Id.* at 31. The nature of this arrangement, the State asserts, imposes "significant administrative and relational costs on farmers," particularly when there are "problems and confusion with [a farmworker's] union membership status." *Id.* at 14, 16. But when an agricultural producer has already agreed to such an arrangement, these "administrative and relational costs" persist, and the agricultural producer remains obligated to continue its relationship with the union. *Id.* at 35. The Dues Provision resolves these complications by allowing agricultural producers to cease processing dues checkoffs at any time doing so becomes too burdensome.

Because the State has offered a "reasonably conceivable state of facts that could provide a rational basis" for its actions, we hold that Section 20.5 withstands constitutional scrutiny.[5] *Orquera v. Ashcroft*, 357 F.3d 413, 425 (4th Cir. 2003) (quoting *Beach Commc'ns*, 508 U.S. at 313).

---

[5] Undeterred, FLOC insists that this is no ordinary case, but that the North Carolina legislature was motivated by bare animus against a politically unpopular group. For this reason, FLOC contends that we must examine Section 20.5's legality "under a more searching form of rational basis review." FLOC Opening Br. at 52. But unlike the cases cited by FLOC, no evidence here suggests that animus against an unpopular group motivated the State. We accordingly apply ordinary principles of rational basis review to Section 20.5.

24

VI.

To summarize, we reverse the district court insofar as it held that the Settlement Provision violates the First and Fourteenth Amendments, and we vacate its injunction as to the same.  We affirm the remainder of the judgment of the district court.  In so holding, we offer no comment on whether Section 20.5 reflects sound public policy.  The judgment of the district court is

*AFFIRMED IN PART, REVERSED IN PART,*
*AND VACATED IN PART.*

RICHARDSON, Circuit Judge, concurring in the judgment:

I agree with my colleagues' judgment but would travel a different path to get there. The majority makes quick work of interpreting the North Carolina Farm Act's Settlement Provision. They say it unambiguously applies narrowly: it "is not aimed at precluding settlements based on *who* the parties are but rather *what* those settlement conditions say." I'm not so sure. And that is ultimately a question for the North Carolina courts.

But how North Carolina might interpret its own statute makes no difference here. In my view, the Constitution permits either the narrow or broad interpretation. For even the broad reading of that provision—that it bars all settlement agreements between an agricultural producer and a labor union—does not violate the First Amendment. The First Amendment protects collective action undertaken to obtain meaningful access to the courts. But the broad reading doesn't lock parties out of the courtroom. Just the opposite: It locks parties inside the courtroom. Because it is clear to me that neither reading of the Settlement Provision would violate the First Amendment, I would leave the statutory interpretation question for a different day before a different court.